IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiffs, | **8:12CR332** |
| v. | |
| DANIEL HERNANDEZ and JUANA BANDA, | **MEMORANDUM AND ORDER** |
| Defendants. | |

This matter is before the court on defendant Daniel Hernandez's objections, Filing No. 53, to the Findings and Recommendation ("F&R") of the magistrate judge, Filing No. 51, F&R and Order; Filing No. 52, Transcript ("Tr.") at 75-90, on the defendant's motion to suppress evidence seized and statements made to officers in connection with a traffic stop on September 18, 2012, in Seward County, Nebraska, Filing No. 34. Both defendants are charged with traveling "in interstate commerce with the intent to distribute the proceeds of an unlawful activity, namely distribution of narcotics in violation of Title 21, United States Code, Section 841 and thereafter performed and attempted to perform an act to distribute the proceeds of such unlawful activity, in violation of 18 U.S.C. § 1952(a)(1)." Filing No. 22, Indictment.

In his motion to suppress, defendant Hernandez challenges the traffic stop, the search of his vehicle, his detention, his arrest, and his questioning by law enforcement officers as violations of the Fourth and Fifth Amendments to the Constitution. The magistrate judge recommended that the court grant the motion with respect to the defendant's first statement, but deny it in all other respects. Filing No. 52, Tr. at 90.

The magistrate judge held an evidentiary hearing on March 27, 2013.  Filing No. 52, Transcript.  Under 28 U.S.C. § 636(b), the court has conducted a de novo review of those portions of the findings and recommendations to which defendant objects.  *United States v. Lothridge*, 324 F.3d 599, 601 (8th Cir. 2003).  The court has reviewed the record, including the transcript of the hearing and the exhibits.  The court generally agrees with the magistrate judge's recitation of the facts, with certain additional findings noted below, but finds error in the magistrate judge's application of the law to the facts.  The court will adopt the magistrate judge's recommendation to grant the defendant Hernandez's motion to suppress the statement he made to Sergeant Vance, but sustains the defendant's objections to the magistrate judge's recommendation to deny the motion in other respects.  For the reasons set forth below, the court finds defendant's objections to the magistrate's F&R should be sustained and defendant Hernandez's motion to suppress should be granted.

I. FACTS

The facts are set forth in the F&R and will be repeated here only as necessary to the court's opinion.  Sergeant Michael Vance, a patrol sergeant with the Seward County Sheriff's Office testified at the hearing.  Filing No. 52, Tr. at 4-50.  He testified that he has been employed with the Seward County Sheriff's Office for six years.  *Id.* at 4.  Prior to that, he worked for seven-and-a-half years as a canine patrol officer in Florida, then worked at the Henderson County, Tennessee, Sheriff's Department for ten years, first as a deputy, later as a captain, and ultimately as chief deputy in charge of narcotics and criminal investigations.  *Id.* at 5-6.  He then was employed as the Chief of Police for the

Santee Sioux Police Department.  *Id.* at 6.  He has had significant training in drug interdiction.  *Id.* at 6-7.

He testified that on September 18, 2012, he received information from Deputy Frye,[1] who reported that he had been contacted by an Iowa trooper.  *Id.* at 9.  The trooper had stopped a vehicle, searched the car and let the occupants go, and later learned, after a Spanish-speaking officer listened to the recording of a conversation between the occupants in the patrol car, that the occupants had discussed a large sum of money that was hidden in the car.  *Id.* at 9.  Sergeant Vance then went to Interstate 80 to look for a gray Jeep Laredo with California license plates.  *Id.* at 9-10.  He saw the defendants' vehicle heading west on Interstate 80 and observed it move from the passing lane to the outside lane without signaling.  *Id.* at 10.  He then conducted a traffic stop.  *Id.* at 11.  He stated that he believed it was about 4:40 p.m.  *Id.* at 12.  Defendant Juana Banda, the registered owner of the vehicle, was in the passenger seat and defendant Daniel Hernandez was the driver.  *Id.*  Vance testified that as he approached the driver's side of the vehicle, he saw Banda place her purse on the floor in front of her. *Id.* at 16.  Defendant Hernandez provided the officer his license and registration.  *Id.* at 13.

Sergeant Vance then asked Hernandez to accompany him to the patrol car.  *Id.* at 14.  While Hernandez and the officer were in the patrol car, Sergeant Vance received a phone call on his cellphone from the trooper in Iowa.  *Id.*  The trooper told Vance that a translator had listened to the recording and the couple had talked about having $28,000 to $30,000 in currency hidden in the vehicle.  *Id.* at 14-15.  Vance testified that

---

[1] Deputy Frye is a trooper from the Seward County Sheriff's Office who is heavily involved in interdiction.  Filing No. 52, Tr. at 52.

Deputy Frye must have given Vance's phone number to the Iowa officer.  *Id.* at 14.  He testified he talked to the trooper for approximately two minutes.  *Id.* at 15.

While Vance prepared a warning citation, he asked Hernandez several questions.  *Id.* at 15-16.  Hernandez stated he was traveling from a Green Bay Packers game but had stayed in Chicago and said that his traveling companion was his girlfriend of eight years.  *Id.*  Sergeant Vance later asked defendant Banda the same questions and was told the couple had stayed in Green Bay and had been dating for five years.  *Id.* at 17.

Vance ran the defendant's license and did not find any outstanding warrants.  *Id.* at 38.  Further, he testified he did not recall any criminal history information.  *Id.*  Sergeant Vance then issued a warning ticket and told Hernandez he was free to go and then asked if Hernandez had any drugs, weapons or money in the vehicle.  *Id.* at 18.  Hernandez responded that he did not and then Vance asked for consent to search the vehicle and Hernandez said, "Yes, sure."  *Id.*  Sergeant Vance then told Hernandez he was going to deploy his drug dog and Hernandez responded "okay."  *Id.* at 21.  Vance testified that the dog is certified as a drug dog and was certified at the time of the stop.  *Id.* at 20.  The dog alerted by scratching and barking on the driver's side.  *Id.* at 23.

Vance then requested backup.  *Id.* at 23-24.  Deputy Down arrived a few minutes later and the two officers proceeded to search the vehicle.  *Id.* at 24.  Vance testified he found $400 wrapped in a rubber band in Banda's purse and another $450 (also wrapped in a rubber band) in the console.  *Id.* at 24-25.  He testified that the money was significant because of the way it was packaged.  *Id.* at 24.  He stated "It's indicative—I see it all the time.  A lot of people moving narcotics money packages it that way.  It's

4

always rubber-banded." *Id.* When he found the money, he told the defendants they were going to be detained. *Id.* at 43-44. He put Hernandez and Banda in separate seats of his squad car. *Id.* at 44. The search continued for approximately an hour and no more money or any drugs were found. *Id.* at 25.

He later acknowledged that it was not illegal to possess or transport money, and that there was nothing illegal about going on vacation and carrying $1,000.00 in cash. *Id.* at 40-41. He stated that $1,000.00 was a reasonable amount of cash to carry on a three-day cross-country trip. *Id.* at 42-43.

Vance then told the defendants that he was going to have the vehicle towed in order to "search it better and informed them that [he] was going to detain them and contact the Department of Homeland Security." *Id.* at 25-26. He stated he called Homeland Security because "[w]hen we have large money seizures, I always contact Homeland Security because of the trafficking of drugs or large amounts of money." *Id.* at 26. He further stated he did not call Homeland Security about the $900 he had found, but "because the trooper told me that the translator had told him that they were talking about it being hidden in the vehicle and it was 28 to $30,000" and "because she had stated on the video that "What do we do if the cops find the money." *Id.* at 44. He stated he did not "think they'd have been worried about $900." *Id.* at 45.

Vance testified he had the car towed and the tow truck arrived after approximately twenty minutes. *Id.* Deputy Down transported the defendants to the sheriff's office in his patrol car. *Id.* The defendants were placed in two separate locked holding areas at the sheriff's office. *Id.* at 28. Sergeant Vance stated the defendants were not free to go at that point, but were not in handcuffs. *Id.*

Vance again searched the vehicle and found bank deposit receipts for deposits of close to $20,000.  *Id.* at 29, 46.  The vehicle was taken to a storage garage approximately six miles away for more searching, and Chief Deputy Hale arrived to assist with the search.  *Id.* at 32.  Deputy Down and another deputy also assisted with the search.  *Id.*  Vance stated that he then told the Chief Deputy that he was going to talk to the defendants.  *Id.* at 30.

The officers then towed the vehicle back to the sheriff's office from the garage. *Id.* at 33.  Vance testified he was told by Chief Deputy Hale that "if you haven't found it at this point, by—when I get there, I'll assist with the search, and if we don't find it, he said, we'll—you can cut them loose and tell them we're going to keep the vehicle because we know it's in there."  *Id.* at 33-34.  Further, Vance testified that the Chief Deputy stated, "[i]f we have to cut some part of the vehicle up and we don't find anything, he said, we'll just have to replace the vehicle, he said, but we know it's in there so I'll try and search—help search.  If we don't find it, then we'll just keep the vehicle."  *Id.* at 34.

He testified he spoke to the girlfriend, Juana Banda, about some money, and then to defendant Hernandez.[2]  *Id.* at 46-47.  Sergeant Vance spoke to defendant Hernandez in Vance's office.  *Id.* at 34.  He testified that Hernandez was not free to go. *Id.*  He did not advise Hernandez of his *Miranda* rights.  *Id.*  Vance testified he lied to Hernandez and told him that the officers had found the money and asked Hernandez to

---

[2] The record indicates that Vance also told Banda that the money had been found and asked if it was from the sale of a truck.  Filing No. 44, Government's Brief at 4; Filing No. 52, Tr. at 3 (noting Banda did not have standing).

tell the location of the money in order to verify that it was Hernandez's money.  *Id.* at 35.
Specifically, he testified:

> I had told him that we'd found the money—well, first, I told him—I said, "You know I talked to your girlfriend," 'cause he saw me walk by with her and he said, "Yeah."  I said, "Well, I found the money."  I said, "I understand you sold a -- you sold a vehicle."  And he said, "Yes, I sold a pickup truck for $28,000."

*Id.* at 35.

Hernandez then stated the money was hidden in socks in a suitcase.  *Id.* at 47.
Chief Deputy Hale and Vance then "picked up the suitcase and opened the socks and there was 24 socks and all 24 had money hidden in them."  *Id.* at 35.  He testified he also talked to defendant Banda.  *Id.* at 34.

Sergeant Vance testified that he lied to Hernandez because he couldn't find the money and was trying to get defendant Hernandez to help him find the money.  *Id.* at 48.  Vance also testified that the interaction was not recorded, "but it wasn't an interrogation.  I mean I didn't question him."  *Id.* at 48.  He explained, "[w]hen we interview people, the—for a recorded interview, we go to Seward Police Department. They have a—a room set up that has built-in mikes and cameras."  *Id.* at 50.  He conceded however that the deputy sheriffs all carry digital recorders and he could have turned it on while he was talking to the defendant.  *Id.* at 49.

Vance did not recall when the officers found the money but knew it was several hours after they arrived at the station.  *Id.* at 36.  He stated that Homeland Security officers had not yet arrived when they found the money.  *Id.*  Vance also testified that he had further contact with Hernandez after Homeland Security arrived.  *Id.*  He stated he

was present when Homeland Security agents interviewed Hernandez, but did not question him. *Id.* at 36.

Homeland Security Investigations Special Agent Douglas Reisz also testified at the hearing. *Id.* at 52-58. He testified he has been an agent for approximately 11 years. *Id.* at 52. He stated his agency has authority to investigate narcotics and currency. *Id.* at 54. On September 18, 2012, Sergeant Vance called him concerning a vehicle that he stopped that he suspected had currency. *Id.* at 53. He testified that Deputy Frye may also have called him, but he could not recall. *Id.* at 53. He testified that "[i]nitially, I got a heads up of what is going on, the facts surrounding it and then I later responded." *Id.* He stated he was told that:

> The Iowa State Patrol officer had made a traffic stop, that they reviewed the tape. They had indications there was currency in the car that was not located. ISP released that vehicle, then called on to Seward who staged up—identified that car and made that traffic stop. They were in the process of locating the currency.

*Id.* at 53. He also stated that he'd "worked with Sergeant Vance a lot. Usually, we respond once currency's located." *Id.* at 54. He testified that Sergeant Vance asked him to come to Seward, but later qualified that statement, testifying that the protocol is that "he tells us the facts and then we'll respond." *Id.* at 54.

Agent Reisz testified that he met another Homeland Security agent, Agent Lee, at a McDonalds on Interstate 80 at midnight or 12:30 that night and then they went to Seward. *Id.* at 54. Once they arrived in Seward, he testified that they met with Sergeant Vance and got basic information on the traffic stop. *Id.* Reisz further stated that he was aware that Vance had spoken to or interviewed Hernandez at the sheriff's office before Reisz got there. *Id.* at 54-55. He stated he had not told Vance to talk to

Hernandez and that it was done without his prior knowledge. *Id.* Reisz testified he did not ask Vance whether Hernandez had been given a *Miranda* warning. *Id.*

Reisz stated he interviewed Hernandez at the Seward County Sheriff's Office with Investigator Lee. *Id.* at 56. The interview was also conducted in the sergeant's office. *Id.* at 36. Agent Lee advised Hernandez of his *Miranda* rights. *Id.* at 56. Reisz testified that Hernandez did not ask for a lawyer or state that he did not want to talk to the agents. *Id.*

Special Agent Mark Lee testified to essentially the same facts. *Id.* at 58-64. Lee testified that he advised Hernandez of his *Miranda* rights, Hernandez appeared to understand them, and did not appear to be under the influence of alcohol or other controlled substances. *Id.* at 60. The officers and Hernandez were all seated, Hernandez was not in handcuffs, and Agent Reisz and Agent Lee did not have their guns displayed. *Id.* at 61. The waiver of rights form indicates that Daniel Hernandez was taken into custody at 11:00 p.m. on September 18, 2012, and signed the waiver document at 2:00 a.m. on September 19, 2012. *See* Ex. 1.

The magistrate judge found that Sergeant Vance's initial conversation with Deputy Frye about the Iowa stop occurred at approximately 4:10 p.m. and the defendants were stopped by Sergeant Vance at 4:40 p.m. *Id.* at 76-77. He found that defendant Hernandez consented to the search approximately 13 minutes after he was stopped. *Id.* at 78. He also found that Vance searched the car for a period of one hour, finding only the rubber-banded rolls of money. *Id.* He found that the drug dog was reliable and its handler was experienced. *Id.* at 80.

The magistrate judge found that Homeland Security was called because of their activity in interdiction in narcotics and currency.  *Id.*  He found Officer Reisz and Officer Lee had "no prior knowledge of the defendant's prior statement to Vance, his questioning or his status of Miranda."  *Id.* at 80.  He also found that Vance had testified that he "did not inform Reisz or Lee of the circumstances of his statements to Hernandez, in the first statement went about lying to him, again Sergeant Vance's words, I'm not characterizing it as that, as to the fact that he had not given Miranda and that they had not located the money but that he had told Hernandez that they had located the money."  *Id.* at 81.

The magistrate judge found that Deputy Vance had probable cause to conduct a traffic stop based on his observation of a minor traffic violation.  *Id.* at 81-82.  He characterized the detention as a "very short detention" of 13 minutes and found the officer's conduct in asking the driver for his license and registration, requesting the driver to sit in the patrol car, and asking the driver about his or her destination and purpose was proper.  *Id.* at 83.  He found defendant Hernandez freely, voluntarily, knowingly and intelligently consented to the search of the vehicle.  *Id.* at 84.  He further found that an exterior dog sniff is not a Fourth Amendment search.  *Id.* at 85.  The magistrate judge also found that the "drug dog alert would also have given probable cause to search the vehicle."  *Id.* at 85-86.

The magistrate judge found that "Miranda did apply" to Sergeant Vance's questioning of Hernandez.  *Id.* at 86.  He found that the defendant was in custody, that he was "either questioned or statements were made which were clearly expected to

10

elicit incriminating statements from the defendant" and concluded that the defendant's statements to Vance in response to questioning should be suppressed. *Id.* at 86.

With respect to the second interrogation, the magistrate judge found that there was no "calculated effort by law enforcement to elicit a confession and then to use Miranda." *Id.* at 87. He credited the testimony of Sergeant Vance and Agents Reisz and Lee in that it provided that "there was no conversation at all and that Reisz and Lee didn't know what had occurred before." *Id.* Relying on *Missouri v. Siebert,* 542 U.S. 600 (2004), the magistrate judge recommended that this court deny defendant Hernandez's motion to suppress the post-*Miranda* statement.

The defendant contends that the magistrate judge erred. The defendant's motion to suppress and his objections to the magistrate judge's findings are based on alleged violations of both the Fourth and Fifth Amendments. He challenges the continued detention of the defendant as well as the recommendation to deny suppression of the second statement. He argues that probable cause to detain the defendants dissipated after no money was located. Further, he argues that the second statement should be suppressed because no curative measures were taken to cure the taint of the earlier unwarned statement, there was no substantial break in time and circumstances between first and second statements, and law enforcement officers failed to explain that the initial custodial statement was likely inadmissible.

II. LAW

A. Fourth Amendment

The Eighth Circuit recognizes "three noncontroversial and well-established principles of Fourth Amendment jurisprudence." *United States v. Aquino*, 674 F.3d 918,

923 (8th Cir. 2012). "First, the scope of an investigatory detention under *Terry v. Ohio,* 392 U.S. 1 (1968), is limited." *Id.*; *see also United States v. Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir.1999) ("Officers must, however, employ the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the *Terry* stop."). Second, where an officer exceeds the permissible scope of *Terry*, the investigatory detention is transformed into an arrest. *Id.*; *see Peterson v. City of Plymouth, Minn.*, 945 F.2d 1416, 1419 (8th Cir. 1991) (listing the factors a court should consider "[i]n determining whether an officer's conduct during a purported investigatory stop exceeded the scope justified under the circumstances, thereby transforming the stop into an arrest"); *see also United States v. Maltais*, 403 F.3d 550, 556 (8th Cir. 2005) (addressing whether an investigatory detention exceeded the permissible scope of *Terry* due to its length and became a "de facto arrest"). Third, a *Terry* stop that becomes an arrest must be supported by probable cause. *Id.* The law distinguishes between a seizure and a stop. *Terry,* 392 U.S. at 10 (1968). While police must have probable cause in order to arrest (or seize) a person, they need only have reasonable suspicion that criminal activity is afoot to stop someone. *Id.* at 27.

### 1.  Search

The Fourth Amendment of the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . .." U.S. CONST. amend. IV. "Generally, to search a private place, person, or effect, law enforcement must obtain a warrant supported by probable cause from a judicial officer." *United States v. Sanders*, 341

F.3d 809, 818 (8th Cir. 2003); *see also Arizona v. Gant*, 556 U.S. 332, 338 (2009)

*Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011) (noting the Supreme Court has long

held that warrants must generally be obtained).

Under the "automobile exception" to the Fourth Amendment, police may conduct

a warrantless search of a vehicle if there is probable cause to believe that the vehicle

contains contraband or other evidence of a crime. *United States v. Winarske*, —F.3d—,

—, 2013 WL 2157815, *4 (8th Cir. May 21, 2013); *United States v. Rodriguez*, 711 F.3d

928, 935 (8th Cir. 2013). A police officer who observes a traffic violation has probable

cause to stop the vehicle and its driver. *Pennsylvania v. Mimms*, 434 U.S. 106, 109

(1977) (per curiam). When a traffic stop is "lawful at its inception and otherwise

executed in a reasonable manner," a dog sniff conducted during the stop does not

infringe on a constitutionally protected privacy interest. *Illinois v. Caballes*, 543 U.S.

405, 408 (2005); *United States v. Olivera-Mendez*, 484 F.3d 505, 509 (8th Cir. 2007).

"A dog's positive indication alone is enough to establish probable cause for the

presence of a controlled substance if the dog is reliable." *United States v. Sundby*, 186

F.3d 873, 876 (8th Cir. 1999).

If probable cause justifies the search of lawfully stopped vehicle, it justifies the

search of every part of the vehicle and its contents that may conceal the object of the

search. *Olivera-Mendez*, 484 F.3d at 512. The Fourth Amendment requires that a

search not continue longer than necessary to effectuate the purposes of an investigative

stop. *Florida v. Royer*, 460 U.S. 491, 500 (1983). More specifically, an investigative

stop must cease once reasonable suspicion or probable cause dissipates. *See United

States v. Watts*, 7 F.3d 122, 126 (8th Cir. 1993); *United States v. Jacobs*, 986 F.2d

1231, 1235 (8th Cir. 1993) (unlawful for police to execute search after they learn that probable cause no longer exists). Probable cause to search a vehicle does not "dissipate" simply because it takes a long time to complete a reasonable and thorough search of the car. Olivera-Mendez, 484 F.3d at 512 (affirming denial of motion to suppress when there was evidence of hidden compartments in the vehicle and it took six hours to locate drugs during examination of the car in the Highway Patrol garage).

### 2. Seizure

#### a. Arrest

The Fourth Amendment "is not triggered by a consensual encounter between an officer and a private citizen." United States v. Villa–Gonzalez, 623 F.3d 526, 531 (8th Cir. 2010). An initially consensual encounter however, "can become non-consensual and therefore 'implicat[e] the Fourth Amendment when, considering the totality of the circumstances, the questioning is so intimidating, threatening, or coercive that a reasonable person would not have believed himself free to leave" or to end the encounter." United States v. Aquino, 674 F.3d 918, 923 (8th Cir. 2012) (quoting Villa-Gonzalez, 623 F.3d at 532. Courts consider seven non-exclusive factors when examining the totality of the circumstances: officers positioning themselves in a way to limit the person's freedom of movement, the presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation indicating compliance is necessary, the officer's retention of the person's property, or an officer's indication the person is the focus of a particular investigation. Aquino, 674 F.3d at 923; United States v. Griffith, 533 F.3d 979, 983 (8th Cir. 2008). "Determining which police-

citizen contacts fall within the protections of the Fourth Amendment and which do not is fact intensive and turns on the unique facts of each case." *Aquino*, 674 F.3d at 923.

Whether a particular seizure amounts to an arrest is a question of law. *United States v. Tovar-Valdivia*, 193 F.3d 1025, 1027 (8th Cir. 1999).

### b. Property

The proposition that law enforcement officers must obtain a warrant supported by probable cause from a judicial officer also holds true for the seizure of property— "[g]enerally, police officers must have a warrant before they can seize a person's property." *United States v. $7,850.00 in United States Currency*, 7 F.3d 1355, 1358 (8th Cir. 1993); *see United States v. Place*, 462 U.S. 696, 701 (1983) (finding a ninety-minute detention of luggage an unreasonable seizure in the absence of probable cause); *Payton v. New York*, 445 U.S. 573, 584 (1980) ("The simple language of the Amendment applies equally to seizures of property."). A search or seizure conducted by the government without a warrant is presumptively unreasonable. *United States v. Kimhong Thi Le*, 474 F.3d 511, 514 (8th Cir. 2007); *United States v. Cedano-Medina*, 366 F.3d 682, 684 (8th Cir. 2004). "The touchstone of the Fourth Amendment's promise is 'reasonableness,' which generally—though not always—translates into a warrant requirement." *United States v. Hatten*, 68 F.3d 257, 260 (8th Cir. 1995). To give rise to probable cause to seize without a warrant, the incriminating nature of the object must be immediately identifiable. *United States v. Bustos-Torres,* 396 F.3d 935 (8th Cir. 2005).

The mere fact of having thousands of dollars in cash on one's person has been held not to justify a seizure of it as suspected contraband or evidence of crime. *United*

*States v. $10,700.00 in United States Currency*, 258 F.3d 215, 232 (3d Cir. 2001); *United States v. $405,089.23 in United States Currency*, 122 F.3d 1285, 1290 (9th Cir. 1997); *United States v. $67,220.00 in United States Currency*, 957 F.2d 280, 285 (6th Cir. 1992). Law-abiding people sometimes carry large amounts of cash on their person; this is thought to be common enough to require evidence connecting the cash to a crime to establish probable cause for seizing the cash. *See Bustos-Torres* at 944-45; *United States v. Hernandez–Rivas*, 348 F.3d 595, 599 (7th Cir. 2003); *United States v. Cervantes*, 19 F.3d 1151, 1153 (7th Cir. 1994). The incriminating nature of cash is not immediately apparent unless there is some additional evidence connecting that cash to criminal activity; thus only some evidence establishing such a nexus could justify the warrantless seizure of money. *See Bustos-Torres* at 945 (defendants had been seen leaving the scene of a suspected drug buy. Probable cause for a seizure is assessed at the time the seizure occurs. See *Anderer v. Jones*, 385 F.3d 1043, 1051 n. 11 (7th Cir. 2004) (probable cause determinations are based on the information available to the police officer at the time of the arrest).

c. Fruit of the Poisonous Tree

If the search or seizure violates Fourth Amendment principles, the "exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search." *Murray v. United States*, 487 U.S. 533, 536 (1988) (citations omitted). "[T]he exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the

unlawful search becomes 'so attenuated as to dissipate the taint.'" *Id.* at 536-537 (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)).

The exclusionary rule applies to both direct and indirect fruits of the constitutional violation, including verbal statements. *Wong Sun*, 371 U.S. 471, 484-85; *see also United States v. Yousif*, 308 F.3d 820, 829 (8th Cir. 2002). "'The exclusionary rule, . . . when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth Amendment." *Taylor v. Alabama*, 457 U.S. 687, 690 (1982) (quoting *Brown v. Illinois*, 422 U.S. 590, 602 (1975)). "The exclusion of a confession made without Miranda warnings might be regarded as necessary to effectuate the Fifth Amendment, but it would not be sufficient fully to protect the Fourth." *Brown*, 422 U.S. at 600-01.

In the Fourth Amendment context, the sole purpose of the exclusionary rule is to deter future unlawful police conduct. *Michigan v. Tucker*, 417 U.S. 433, 446 (1974). Violations of the Fourth Amendment have traditionally mandated a broad application of the "fruits of the poisonous tree" doctrine. *Oregon v. Elstad*, 470 U.S. at 306. Under the Fourth Amendment, in order to break a causal chain between an illegal arrest and a statement made subsequent thereto, "*Wong Sun* requires not merely that the statement meet the Fifth Amendment standard of voluntariness, but that it be 'sufficiently an act of free will to purge the primary taint.'" *Brown*, 422 U.S. at 601-02 (quoting *Wong Sun*, 371 U.S. at 486) . "The controlling question is 'whether granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Yousif*, 308 F.3d at 829 (quoting *Wong Sun*, 371 U.S. at 488);

*United States v. Hernandez-Hernandez*, 384 F.3d 562, 565 (8th Cir. 2004) ("Statements that result from an illegal detention are not admissible.").  When unwarned statements are themselves fruits of an illegal seizure, *Wong Sun* is applicable.  *Villa-Gonzalez*, 623 F.3d at 535.  Any evidence "obtained by exploitation of [an unlawful detention] instead of by means sufficiently distinguishable to be purged of the primary taint" must be excluded.  *United States v. Flores-Sandoval*, 422 F.3d 711, 714 (8th Cir. 2005).  "In order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken, *Wong Sun* requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint.'"  *Brown v. Illinois*, 422 U.S. at 602 (quoting *Wong Sun,*, 371 U.S. at 486).  In some cases, giving a *Miranda* warning may break the causal chain between the illegal arrest and the statement, thereby rendering the statement admissible.  *Flores-Sandoval*, 422 F.3d at 714.  The government, however, bears the burden of showing the admissibility of the statement, i.e., that a defendant waived his *Miranda* rights and made a free and voluntary confession.  *See id.*  To decide whether a confession is the product of a free will in determining whether a confession has been purged of the taint of the illegal arrest, courts consider *Miranda* warnings, the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct.  *Brown,* 422 U.S. at 603-04; *Hernandez-Hernandez*, 384 F.3d at 565.  The fact that the confession may be "voluntary" for purposes of the Fifth Amendment, in the sense that *Miranda* warnings were given and understood, is not by itself sufficient to purge the taint of the illegal arrest.  *Taylor*, 457 U.S. at 690 (involving a situation wherein the defendant was

arrested without probable cause in the hope that something would turn up, and he confessed shortly thereafter without any meaningful intervening event); *see also* *Dunaway v. New York*, 442 U.S. 200, 217 (1979).

B. Fifth Amendment

When a suspect is interrogated in a custodial setting, the police must advise him of his right not to answer questions and to have an attorney present during questioning. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).   The clearest example of custody is when a suspect is placed under formal arrest, but, absent a formal arrest, the police must give *Miranda* warnings when the suspect's freedom of movement is restricted to a degree akin to a formal arrest.   *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam); *United States v. Ollie,* 442 F.3d 1135, 1137 (8th Cir. 2006); *United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir.2004) (en banc); *United States v. Wise*, 588 F.3d 531, 536 (8th Cir. 2009).   A suspect is entitled to these warnings prior to undergoing a custodial interrogation—"when an officer's interaction with the suspect is 'likely to elicit an incriminating response.'"   *Wise*, 588 F.3d at 536 (quoting *United States v. Torres-Lona*, 491 F.3d 750, 757 (8th Cir. 2007)).   An "interrogation occurs when a law enforcement officer engages in 'either express questioning or its functional equivalent.'"   *United States v. Aldridge*, 664 F.3d 705, 711 (8th Cir. 2011) (quoting *United States v. Hernandez–Mendoza*, 600 F.3d 971, 976–77 (8th Cir. 2010).   "[W]ithout proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda*, 384 U.S. at 467.

Under the Fifth Amendment, even if a *Miranda* violation is found, that does not render all later statements automatically inadmissible. *Elstad*, 470 U.S. at 318; *United States v. Ambrose*, 668 F.3d 943, 955 (7th Cir. 2012). Briefly, where the previous un-Mirandized statements were nevertheless voluntary, subsequent statements made after *Miranda* warnings are provided are admissible. *Id.*; *United States v. Walker*, 518 F.3d 983, 985 (8th Cir. 2008). The test for admitting a later statement—one not made in response to unwarned custodial interrogation—depends on whether the prior statements made in response to *Miranda*-violating interrogation were nonetheless voluntary. *United States v. Richardson*, 657 F.3d 521, 525 (7th Cir. 2011). "If so, any later voluntary statement is admissible; if not, any later statement is admissible only if there was 'a sufficient break in the stream of events to insulate the second confession from the earlier taint.'" *Id.* (quoting *Watson v. DeTella,* 122 F.3d 450, 454 (7th Cir. 1997)); *Elstad*, 470 U.S. at 309.

"A suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda warnings.*" *Elstad*, 470 U.S. at 318 (involving a good-faith effort by police to administer a proper *Miranda* warning and requiring "careful and thorough" administration of *Miranda* warnings when postwarning confession was preceded by a voluntary but unwarned confession). Under *Elstad,* "[a] subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Id.; Wise*, 588 F.3d at 536.

"'A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination.'" *LeBrun*, 363 F.3d at 724 (quoting *Simmons v. Bowersox*, 235 F.3d 1124, 1132 (8th Cir. 2001)).  Whether a confession is involuntary is judged by the totality of the circumstances.  *LeBrun*, 363 F.3d at 724.  "The court must look at the 'conduct of the officers and the characteristics of the accused.'"  *Id.* (quoting *Wilson v. Lawrence County*, 260 F.3d 946, 952 (8th Cir. 2001)).  The government bears the burden of persuasion and must prove by a preponderance of the evidence that the challenged statements were voluntary.  *LeBrun*, 363 F.3d at 724; *United States v. Astello*, 241 F.3d 965, 966 (8th Cir. 2001)

In *Missouri v. Seibert*, 542 U.S. 600 (2004), a divided Supreme Court held that a post-*Miranda* statement that follows an earlier unwarned, though voluntary, statement is nonetheless inadmissible if an officer deliberately delays administering a warning in an effort to elicit a confession.  *Id.* at 612 (plurality opinion).  *Seibert* lays out an exception to *Elstad* for cases in which a deliberate, two-step strategy is used by law enforcement to obtain a postwarning confession.  *United States v. Hernandez-Hernandez*, 384 F.3d 562, 566 (8th Cir. 2004).

Justice Kennedy concurred in the result in *Seibert*, but wrote separately to express the view that the Court's reasoning would apply only to the intentional use of a two-step interrogation process in an effort to circumvent *Miranda* requirements.  *Seibert, 542 U.S. at 622* (Kennedy, J., concurring).   Justice Kennedy would suppress postwarning statements only where the police intentionally used the two-step interrogation technique to render *Miranda* warnings ineffective.  *Ollie, 442 F.3d 1135*.

Such statements would be inadmissible unless the police took curative measures that would ensure that a reasonable person would understand his or her rights.  *Id.*  Justice Kennedy's narrower test applies to the "infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning" and no curative measures were taken to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver.  *Siebert,* 542 U.S. at 622; *see United States v. Elzahabi*, 557 F.3d 879, 884 (8th Cir. 2009) (stating "*Siebert* requires that a court determine whether an officer's interrogation technique was a 'designed,' 'deliberate,' or 'calculated' circumvention of *Miranda.*"); *United States v. Black Bear*, 422 F.3d 658, 664 (8th Cir. 2005).  The strategy of deliberately withholding *Miranda* warnings until after a suspect has already confessed "is based on the assumption that *Miranda* warnings will tend to mean less when recited midinterrogation, after inculpatory statements have already been obtained."  *Siebert,* 542 U.S. at 620 (Kennedy, J., concurring).  The quintessential two-step technique involves a suspect's "hearing warnings only in the aftermath of interrogation and just after making a confession," with the police "lead[ing] him over the same ground again."  *Id.* at 613 (plurality opinion).  In the Eighth Circuit, Justice Kennedy's concurrence is controlling since "it provided the fifth vote necessary for a majority and since it was decided on narrower grounds than the plurality opinion." *United States v. Torres–Lona*, 491 F.3d 750, 758 (8th Cir. 2007).

Where a defendant alleges that his post-*Miranda* statement was obtained in the course of a two-part interrogation, the prosecution bears the burden of establishing by a preponderance of the evidence that the failure to provide warnings at the outset of

interrogation was not deliberate. *Torres-Lona*, 491 F.3d at 758; *Ollie*, 442 F.3d at 1142-43 (8th Cir. 2006) (noting that placing that burden on the prosecution is consistent with prior Supreme Court decisions that require the government to prove the admissibility of a confession before it may come into evidence, that put the burden on the government to prove that a suspect's confession was not the fruit of an earlier illegal arrest, and that put the burden on the prosecution to prove, by a preponderance of the evidence, that the suspect waived *Miranda* rights). The Eighth Circuit acknowledges that "the law generally frowns on requiring a party to prove a negative," but finds that "where one side typically possesses all or most of the pertinent evidence, it is appropriate to burden it with proving the relevant matter." *Id.* (finding the government failed to meet the burden because it produced no evidence on the question at all).

A court should review "the totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness." *United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010); *United States v. Williams*, 681 F.3d 35, 41 (2d Cir. 2012). Courts are mindful that evidence of deliberateness or lack thereof is in the hands of the government. *United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010). Further, the "party seeking to introduce [a] confession should remain responsible for showing that it was not obtained through a subterfuge." *Id.* There is no exception to *Miranda* that allows a delay in giving *Miranda* warnings in order to preserve evanescent evidence nor an exception that permits delaying the warnings in order to ascertain whether a suspected co-conspirator may be entitled to release. *Id.* at 480-81 (observing that only public safety is an excuse). Inexperience, while not a legitimate excuse for postponing a *Miranda* warning, nevertheless may save a confession from

23

exclusion under *Seibert*.  *See id.* at 481; *United States v. Naranjo*, 426 F.3d 221, 232 (3d Cir. 2005) (implying that an "inadvertent" *Miranda* omission, or a "rookie mistake," should not warrant *Seibert* scrutiny).

When an officer deliberately undermines the effectiveness of the Miranda warning by conducting an initial unwarned interrogation, the postwarning confession must be excluded unless appropriate curative measures were taken before the postwarning confession was made.  Id. at 232; see *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring).  Appropriate "'curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the Miranda warning and of the Miranda waiver.'"  Id. (quoting *Seibert*, 542 U.S. at 622) (Kennedy, J., concurring)).  Possible curative steps include a "substantial break in time and circumstances between the prewarning statement and the Miranda warning" and an explanation that the prewarning custodial statement is likely inadmissible.  *Seibert,* 542 U.S. at 622.

III.  DISCUSSION

The court agrees with the magistrate judge's finding that the traffic stop and initial search of the defendants' vehicle were appropriate.  The officer's observation of a traffic violation—improper lane change—provided probable cause for the stop.  Hernandez consented to the search of the vehicle, but in any event, the positive dog-sniff provided probable cause to search the vehicle.  Under the automobile exception, a search is permissible if supported by probable cause to believe contraband or evidence of a crime will be found in the vehicle.

The court finds, however, that the detention of the defendants after Sergeant Vance conducted an hour-long search, found no drugs and found only two rolled-up bundles of cash totaling $900, was a de facto arrest effected without probable cause. The illegality of the seizure was compounded by the continued detention of the defendants at the sheriff's office.

It is not disputed that Sergeant Vance told the defendants they were going to be detained as soon as he found rubber-banded rolls of currency in the vehicle. At that point, the defendants were placed in the patrol car. Sergeant Vance admitted they were not free to go. He told them they would be detained and their car would be towed. The drug dog's positive alert had given the officer probable cause to search the car, but an exhaustive hour-long search by two law enforcement officers revealed no drugs. There is no evidence that the officers found anything that would suggest tampering with the vehicle or that there were any modifications or hidden compartments in the vehicle.

The court finds that the officer placed the defendants under arrest when he informed them they were going to be detained and placed them in the patrol car. At that moment, the defendants were restrained and, by any reasonable standard, were not free to leave. The consensual encounter or investigative detention had evolved into full-blown arrest for which probable cause is required. Both the vehicle and the cash that had been found in the vehicle were similarly seized at that time. Having found that the defendants and property were "seized" for Fourth Amendment purposes, the next issue is whether the arrests and seizures, at the time they were made, were supported by probable cause.

The facts known to the officers before arresting the defendants and seizing the currency and vehicle included the following:  The defendants had given vaguely inconsistent answers to Sergeant Vance's questions,[3] the officer found approximately $900 in defendant Banda's purse and in the vehicle console, but acknowledged that the sum was a reasonable amount to carry on a cross-country trip, an Iowa trooper had reported an overheard conversation about currency in the car, and a drug dog had alerted to the car but the officers had searched the car for over an hour and did not find drugs or other money.  In examining those facts, the court concludes that the police officers did not have probable cause to arrest the defendants, seize the currency from the console and from Banda's purse and tow the vehicle.  It is not illegal to carry currency.  There was no reason to believe the currency was itself contraband or contained contraband, and no evidence to connect the currency to drug trafficking or other illegal activities.  The officer's knowledge of the reported overheard conversation might provide a reasonable articulable suspicion that would justify a search or provide grounds to obtain a warrant, but without more, would not provide probable cause to support the arrest and continued detention of the defendants, especially in light of the fruitless search of the vehicle.

Although the officers' testimony was vague on the exact timeframe, the record shows the defendants must have arrived at the sheriff's office sometime around 6:00 p.m. and continued to be detained there until 2:00 a.m., when defendant Hernandez signed the waver of his *Miranda* rights.  *See* Ex. 1.  During that time, the vehicle was

---

[3] The evidence of inconsistency is thin.  One defendant stated they spent the night in Chicago; one testified they stayed in Green Bay.  They could have stayed in both places.  Banda first identified herself as Hernandez's wife, but later stated she was his girlfriend and the two disagreed on how long they had been "together."  These purported inconsistencies can also be explained by differences in perception between the two defendants.  At any rate, the purported inconsistencies are immaterial.

exhaustively searched and no contraband was found.  Also, the officers obtained additional information—they found receipts for banks deposits amounting to about $20,000 and they learned, if they had not known it before, that the defendant's explanation for possession of a large amount of money was the recent sale of a truck. That evidence can be viewed as exculpatory, in that provided context for the overheard conversation.  It does not provide any link to illegal activities, and whatever tenuous link to drug activity that may have been provided by the dog sniff was further attenuated with the failure to find any drugs in the car after more intensive searching.  After the search dispelled any reasonable suspicion of drugs, the continued detention of the defendants was not supported by probable cause.

The court agrees that the magistrate judge's conclusion that the statements made in response to Sergeant Vance's questioning should be suppressed.  The government concedes that the statements made to Sergeant Vance were in violation of *Miranda*.  See Filing No. 44, Government's Brief at 4.  The court agrees with the magistrate judge's finding that Hernandez was in custody and the government concedes that no *Miranda* warning was given.  No one challenges that the questions were intended to elicit inculpatory responses.[4]  Because the magistrate judge found a *Miranda* violation, and thus presumed coercion, he did not address the issue of whether the initial statement, though unwarned, was voluntary.  The court notes, however, that nothing in this record indicates the statement was in any way voluntary.  The burden is on the government to prove the voluntariness of a confession.

---

[4] The fact that the statement that enabled the officers to locate (and seize) the money is not technically inculpatory, since the possession of the money, standing alone, is not criminal conduct, is no consequence to this analysis since the officers based the decision to take the defendants into official custody on the fact that the defendants possessed, and the officers had found, the sum of $28,000.  The *Miranda* waiver form indicates that the defendant was taken into custody at 11:00 p.m. that night.

The defendant had been transported to the sheriff's office, detained for several hours in a separated area, questioned in a police-dominated environment, and the officer employed a deceptive stratagem. The court finds that the government did not sustain its burden to prove that the initial statement was voluntary.

Evidence obtained by exploitation of an unlawful detention and statements that result from an illegal detention are inadmissible unless the government shows that the statement is sufficiently an act of free will to purge the primary taint. The court finds that the government has not sustained its burden to show that defendant Hernandez's subsequent statement to the Homeland Security officers was a sufficient act of free will to purge the taint of the illegal detention. Although Homeland Security officers administered the *Miranda* warning, the confession closely followed the initial unwarned statement with no intervening circumstances. At the time of the second statement, Hernandez had been detained for about seven or eight hours. The purpose and flagrancy of the official misconduct weighs in favor of a finding that the statement is inadmissible. Defendant Hernandez was arrested without probable cause, was detained for a period of eight hours, was not given *Miranda* warnings until after he was questioned, using deception, about the location of the money, was taken into official custody after officers found the money and was again questioned in the same location and in the presence of the same officer, after having been given *Miranda* warnings. The court finds the second statement and the seized money should be suppressed as fruit of the poisonous tree for the Fourth Amendment violation.

Alternatively, even if the court did not find a Fourth Amendment violation, the second statement is nonetheless inadmissible because it followed the admitted Fifth

Amendment violation.  The court finds the magistrate judge erred in his analysis of the Fifth Amendment issue.   Because the government has not shown that the initial statement was voluntary, the more relaxed standards for indirect fruits of a constitutional violation announced in *Oregon v. Elstad* and *Missouri v. Siebert* do not even come into play, and the situation remains governed by *Wong Sun*.   That finding is of no consequence, however, because even under the more relaxed standard, the questioning of Hernandez does not pass constitutional muster.

The court finds the government has failed to sustain its burden to prove, by a preponderance of evidence, that the failure to warn in this case was not deliberate.   On this record, the court has no trouble finding that the officers' actions are sufficiently indicative of a deliberate circumvention of *Miranda* to require suppression of the statements.   The totality of the circumstances shows that any evidence proffered by the government to show that Hernandez was not the subject of a deliberate, two-step interrogation is outweighed by subjective and objective evidence to the contrary.   The magistrate judge's findings that there had been no contact or conversation between the Homeland Security agents and Sergeant Vance and that Reisz and Lee were not aware of the circumstances of the initial interview is not supported by the record.   Although Agent Reisz testified that Sergeant Vance conveyed to him "just the facts," that testimony does not compel the conclusion that Reisz was not aware of the content or circumstances of the initial interrogation.   Sergeant Vance had to be aware of the defendants' justification that they sold a truck in order to have formulated his ruse.   Reisz testified that he was aware that Sergeant Vance had talked to defendant Hernandez before the Homeland Security officers arrived at the sheriff's office.

29

Sergeant Vance testified he was present when the Homeland Security officers interviewed Hernandez.  Agent Reisz must have been aware that the money had been found because he testified that, ordinarily, the agents responded after the money was located.   The sequence of events also suggests that there was some additional communication between the officers.  Sergeant Vance first called Homeland Security in the late afternoon of September 18, 2012, but the agents did not go to Seward to conduct their investigation until after midnight that day.   Reisz had to have been informed at some point of the fact that the money had been found and probably the circumstances.   The nature and extent of Agent Reisz's knowledge of the circumstances of the initial interrogation, or lack thereof, is absent in the record. Because the burden is on the government to disprove deliberate use of a two-step technique to undermine *Miranda*, one would assume that if there were evidence to support a complete lack of complicity or knowledge, that evidence would have been presented at the hearing.

Further, there is no break in continuity between the initial and subsequent statements.  The evidence shows that the officers regarded defendant Hernandez as having been arrested at 11:00 p.m.   The record does not show what crime the defendants were charged with.  Notably, Sergeant Vance did not present any excuse or rationale for his failure to administer a *Miranda* warning to defendant Hernandez at any time after the de facto arrest of Hernandez and Banda in the late afternoon/early evening of September 18, 2011.  Sergeant Vance candidly admitted that the defendants were not free to go at any time after he found the rubber-banded rolls of $900 in the vehicle.  He also admitted that the goal of questioning Hernandez was to locate the

money.  Nothing appears in this record that would justify delaying a *Miranda* warning once it was obvious that the suspect was in custody.

Sergeant Vance's oblique references to the conversation or "talk" with Hernandez not amounting to an "interrogation" are disingenuous.  Sergeant Vance is not a rookie or inexperienced officer.  He had sufficient experience to know that a *Miranda* warning was unquestionably necessary in connection with Hernandez's custodial interrogation.  Further, the evidence shows that the officers had no intention of returning the defendants' vehicle to them in any event.  Under these circumstances, the court finds it hard to conceive that Sergeant Vance's failure to Mirandize Hernandez was accidental or inadvertent.  Sergeant Vance was not operating under time pressure or any other exigency.  In fact, the evidence that the officers had may likely have supported a search warrant and the officers had ample time to obtain one.

The unwarned and postwarning interrogations can be viewed as one continuum.  Both were conducted in the same setting *in police custody*—both in the sergeant's office at the Seward County Sheriff's facility.  The inquisitorial environment of the questioning was consistent: it was a police-dominated environment.  Also, there was continuity of characters, Sergeant Vance conducted the first interrogation and Agents Lee and Reisz conducted the second one, but Sergeant Vance was present at both.  The timing of Hernandez's "arrest" at 11:00 p.m. and the signing of the waiver at 2:00 a.m. the following morning, as shown in Exhibit 1, suggests the two interviews were not separated by a significant period of time.

Agent Reisz testified he did not know that Hernandez had not been Mirandized in the conversation with Sergeant Vance.  In view of Sergeant Vance's presence at the

second interview, this testimony is problematic.  It suggests either willful blindness on the Homeland Security officers' part or lack of candor on Sergeant Vance's part.  In either event, the implication is that some or all of the officers made a deliberate effort to circumvent *Miranda*.

Moreover, there is no evidence that any curative measures were employed.  There is no evidence that Hernandez was informed prior to giving a confession that his unwarned statement was likely inadmissible.  There is nothing in the record that would clearly alert a detainee in Hernandez's position that the *Miranda* warning marked a significant change in the legal consequences of his statements.

Here, as in *Siebert*, the *Miranda* warnings did not "effectively advise the suspect that he had a real choice about giving an admissible statement" because the unwarned and warned interrogations blended into one "continuum." *Siebert*, 542 U.S. at 612.  No significant break in time or dramatic change in circumstances created "a new and distinct experience," ensuring that the defendant's prior, unwarned interrogation did not undermine the effectiveness of the *Miranda* warnings he received before confessing. *Id.* at 615, 622 (Kennedy, J., concurring) ("For example, a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn"); *see also Bobby v. Dixon*, 132 S. Ct. 26, 31 (2011) (finding police did not violate defendant's *Miranda* rights by interrogating him five days after he had refused, during an un-Mirandized chance encounter with a detective, to speak with the detective without his lawyer present).

Accordingly, the court finds that defendant Hernandez's statements to Homeland Security officers should be suppressed.  Accordingly,

IT IS ORDERED:

1.   Defendant Hernandez's objection (Filing No. 53) to the magistrate judge's findings and recommendation (Filing Nos. 51 & 52) is sustained in part, in accordance with this Memorandum and Order.

2.   The findings and recommendation of the magistrate judge (Filing Nos. 51 & 52) are adopted in part and rejected in part, in accordance with this Memorandum and Order.

3.   Defendant Hernandez's motion to suppress (Filing No. 34) is sustained.

DATED this 18th day of June, 2013.

BY THE COURT:

s/ Joseph F. Bataillon
United States District Judge